## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ADAM M. FRIED, DERIVATIVELY ON BEHALF OF REALOGY HOLDINGS CORP, <br><br> Plaintiff, <br><br> v. <br><br> FIONA P. DIAS, MATTHEW J. ESPE, V. ANN HAILEY, BRYSON R. KOEHLER, DUNCAN L. NIEDERAUER, RYAN M. SCHNEIDER, ENRIQUE SILVA, RICHARD A. SMITH, SHERRY M. SMITH, CHRISTOPHER S. TERRILL, MICHAEL J. WILLIAMS, RAUL ALVAREZ, TIMOTHY B. GUSTAVSON, and ANTHONY E. HULL, <br><br> Defendants, <br><br> -and- <br><br> REALOGY HOLDINGS CORP., <br><br> Nominal Defendant. | Civil Action No. _____ <br><br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |

Adam M. Fried, by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Realogy Holdings Corp. ("Realogy" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Fiona P. Dias, Matthew J. Espe, V. Ann Hailey, Bryson R. Koehler, Duncan L. Niederauer, Ryan M. Schneider, Enrique Silva, Richard A. Smith, Sherry M. Smith, Christopher S. Terrill, Michael J. Williams, Raul Alvarez, Timothy B. Gustavson and Anthony E. Hull (collectively, the "Individual Defendants," and together with Realogy, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Realogy, unjust enrichment, waste of corporate assets, and violations of Sections 14(a) of the

Securities Exchange Act of 1934 (the "Exchange Act"). As for his Verified Derivative Complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Realogy, news reports, securities analysts' reports, advisories about the Company, the decision in the action, and other information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Realogy's directors and officers.

2.      Realogy is an integrated provider of residential real estate services in the U.S. and is the world's largest franchisor of residential real estate brokerages with some of the most recognized brands in the real estate industry, the leading U.S. residential real estate brokerage (based upon transaction volume), the leading provider of global relocation services, and a significant provider of title and settlement services revenue derived on a fee-for-service basis.

3.      Realogy's operating platform is supported by a portfolio of franchise brokerage brands, including Century 21®, Coldwell Banker®, Coldwell Banker Commercial®, ERA®, Sotheby's International Realty® and Better Homes, Gardens® Real Estate and Corcoran®.

4.     The Company also owns and operates brokerages under the Coldwell Banker®, Coldwell Banker Commercial®, Corcoran®, Citi HabitatsSM, Climb Real Estate®, Sotheby's International Realty® and ZipRealty® brands.

5.     Realogy was one of a number of leading real estate brokerage companies that engaged in anticompetitive actions which prompted the U.S. Department of Justice ("DOJ") to open an antitrust investigation into the real estate industry's practices regarding brokers' commissions. That conduct would also lead to Realogy being named as a defendant in an antitrust class action entitled *Moehrl, et al. v. The National Association of Realtors, et al.*, Civil Action Nos. 19-cv-01610 and 19-cv-2544 (N.D. Ill.) ("*Moehrl* Action"). The *Moehrl* action asserts that the National Association of Realtors ("NAR") and the four largest national real estate brokers in the United States, including Realogy, entered into an agreement, and combined and conspired to impose, implement and enforce anticompetitive restraints that cause home sellers to pay inflated commissions on the sale of their homes, in violation of federal antitrust law. That action asserts that NAR and its co-conspirators require every seller's broker, when listing a property on a Multiple Listing Service, to make a "blanket unilateral offer[] of compensation" to any broker who may find a buyer for the home (the "buyer-broker") (the "Antitrust Misconduct"). As a result of that conduct being investigated by the DOJ, the conduct alleged in the *Moehrl* Action, Realogy and its shareholders are being damaged.

6.     There is also a similar antitrust class action entitled *Sitzer, et al. v. The National Association of Realtors, Inc., et al.* Case No. 4:19-cv-00332-SRB, pending in the United States District Court for the Western District of Missouri ("*Sitzer* Action").  On October 16, 2019, the court in *Sitzer* denied a motion to dismiss in that action. There, plaintiff alleged that defendants, which also include several large real estate brokerages or parents of numerous real estate

brokerages, including Realogy, adopted and imposed anticompetitive restraints that inflated the residential real estate commissions throughout Missouri based on the implementation of a rule that requires all seller's brokers to make blanket, unilateral and effectively non-negotiable offers of buyer broker compensation when listing a property on the Multiple Listing Service. The District Court found that the complaint adequately alleged that the defendants agreed to carry out the anti-competitive policies and each of the brokerage defendants "knew of, complied with, participated in, and benefitted from anti-competitive provisions." As a result, the likelihood of a significant class action judgment against Realogy has just significantly increased and thus, Realogy is subject to a higher likelihood of incurring damages.

7.      Defendants also made a series of materially false and misleading statements and omitted to disclose material facts regarding the Antitrust Misconduct between February 24, 2017 and May 22, 2019. As a result, a securities class action entitled *Tanaskovic v. Realogy Holdings Corp.*, *et al.*, 19-cv-15053 (D.N.J.) (*"Tanaskovic* Action") was filed and it is likely liability, attorney's fees, and expenses will be incurred, and Realogy and its shareholders are being damaged. The Individual Defendants breached their fiduciary duties to Realogy and its shareholders by engaging in the Antitrust Misconduct and issuing materially false and misleading statements in violation of the Securities Laws.

8.      The Individual Defendants further breached their fiduciary duties by causing the Company to fail to maintain internal controls which, if implemented, would have provided some backup system to help assure that the statements made in the name of the company were not materially false and misleading and did not omit to disclose material facts about Realogy's anti-competitive behavior.

9.      As a result of the foregoing, the Individual Defendants' and Company's public statements, identified below, were materially false and misleading at all relevant times. The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

## II.   JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

11.      This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

12.      Venue is proper in this District because the Company's headquarters are in this District.

## III.   PARTIES

13.      Plaintiff is a current shareholder of Realogy common stock. Plaintiff has held Realogy common stock during a period when the Defendants were engaging in the conduct complained of below.

14.      Defendant Fiona P. Dias ("Dias") became a member of the board in June 2013 and has served as a member of the Nominating and Corporate Governance Committee and Compensation Committee since August 2013.

15.     Defendant Matthew J. Espe ("Espe") became a member of the Board in August 2016. He was appointed to the Compensation Committee effective December 31, 2017.

16.     Defendant V. Ann Hailey ("Hailey") has been a director of the Company since February 2008 and has been chair of the Audit Committee since February 2008 and a member of the Nominating & Corporate Governance Committee since October 2012.

17.     Defendant Bryson R. Koehler ("Koehler") joined the Board in January 2019 and serves on the Technology and Data Committee.

18.     Defendant Duncan L. Niederauer ("Niederauer") has served as a Director of the Company since January 2016 and Chair of the Compensation Committee since May 2016.

19.     Defendant Ryan M. Schneider ("Schneider") became Realogy's Chief Executive Officer effective December 31, 2017 and became a member of the board at that time. He joined the Company as President and Chief Operating Officer in October 2017.

20.     Defendant Enrique Silva ("Silva") became a member of the Board in August 2018 and has served as a member of the Audit Committee since his appointment to the Board.

21.     Defendant Sherry M. Smith ("S. Smith") became a member of the Board in December 2014 and has served as a member of the Audit Committee since her appointment to the Board.

22.     Defendant Richard A. Smith ("R. Smith") served as President and Chief Executive Office of Realogy from November 13, 2007 until his retirement on December 31, 2017. He was Chairman of the Board from March 2012 until his retirement and served as a Director from July 2006 until his retirement.

23.     Defendant Christopher S. Terrill ("Terrill") joined the Board in July 2016. He has served as Chair of our Data and Technology Committee since August 2018.

24.     Defendant Michael J. Williams ("Williams") was appointed Chairman of Realogy's Board of Directors effective December 31, 2017. He has been a Director and a member of the Audit Committee and the Nominating and Corporate Governance Committee since November 1, 2012, Chair of the Nominating and Corporate Governance Committee since August 2013, and a member of the Compensation Committee since January 7, 2013.

25.     Defendant Raul Alvarez ("Alvarez") joined the Board in August 2013 and served until May 2018.

26.     Defendant Anthony E. Hull ("Hull"), was the Executive Vice President, Chief Financial Officer and Treasurer of the Company at all times relevant to this action up until his retirement on November 5, 2018. Hull, following his retirement as Chief Financial Officer and Treasurer, continued to be employed by Realogy as a senior advisor to Chief Executive Officer and President Ryan M. Schneider until March 31, 2019.

27.     Timothy B. Gustavson ("Gustavson") has served as Realogy's senior vice president, chief accounting officer, and controller since March 2015.

28.     Nominal Defendant Realogy is a Delaware corporation with its principal executive offices at 175 Park Avenue, Madison, NJ 07940. Realogy stock trades on the New York Stock Exchange under the ticker symbol "RLGY."

## IV.     THE MATERIALLY FALSE AND MISLEADING PROXY STATEMENTS

### A.  The 2017 Proxy Statement

29.     On March 17, 2017, the Company filed with the SEC its Proxy Statement on Form 14a (the "2017 Proxy Statement"). The 2017 Proxy Statement identified the persons being nominated for directors in connection with the Company's Annual Meeting of Shareholders, which

was held on May 3, 2017. In addition, it provided the Company's Code of Business Conduct and

Ethics, which states: in relevant part:

> Our Board has adopted a code of ethics (the "Code of Conduct") which applies to all officers and employees, including our principal executive officer, principal financial officer and principal accounting officer. The Code of Conduct is available on the Governance page of Realogy's website at www.realogy.com. The purpose of the Code of Conduct is:
>
> - to promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
>
> - to promote full, fair, accurate, timely and understandable disclosure in periodic reports required to be filed by the Company;
>
> - to protect Company information and assets; and
>
> - to promote compliance with all applicable laws, rules and regulations that apply to the Company and its officers.

30.    The 2017 Proxy Statement also stated, among other things,

> Strong corporate governance is an integral part of our core values and practices. Please visit our website at www.realogy.com under the Governance page for the Board's Corporate Governance Guidelines, Director Independence Criteria, the Code of Ethics for Employees, the Code of Business Conduct and Ethics for Directors, the Board-approved charters for the Audit, Compensation and Nominating and Corporate Governance Committees and related information.[1]

### B. The 2018 Proxy Statement

31.    On March 16, 2018, the Company filed with the SEC its Proxy Statement on Form 14a (the "2018 Proxy Statement"). The 2018 Proxy Statement identifies the persons being nominated as directors in connection with the Company's Annual Meeting of Shareholders, which

---

[1] Realogy's Code of Business Conduct and Ethics for Directors referenced in the 2017, 2018 and 2019 Proxy Statement, states, among other things, "Realogy Holdings Corp. is committed to conducting business in accordance with the highest standards of business ethics and complying with applicable laws, rules and regulations. In furtherance of this commitment, the Board of Directors (the "Board") promotes ethical behavior, and has adopted this Code of Business Conduct and Ethics for Directors ("Code")."

was held on May 2, 2018. In addition, it provides the Company's Code of Business Conduct and Ethics, which stated: in relevant part:

> Our Board has adopted a code of ethics (the "Code of Conduct") which applies to all officers and employees, including our principal executive officer, principal financial officer and principal accounting officer. The Code of Conduct is available on the Governance page of Realogy's website at www.realogy.com. The purpose of the Code of Conduct is:
>
> - to promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
>
> - to promote full, fair, accurate, timely and understandable disclosure in periodic reports required to be filed by the Company;
>
> - to protect Company information and assets; and
>
> - to promote compliance with all applicable laws, rules and regulations that apply to the Company and its officers.

32.     The 2018 Proxy Statement also stated, among other things:

> Strong corporate governance is an integral part of our core values and practices. Please visit our website at www.realogy.com under the Governance page for the Board's Corporate Governance Guidelines, Director Independence Criteria, the Code of Ethics for Employees, the Code of Business Conduct and Ethics for Directors, the Board-approved charters for the Audit, Compensation and Nominating and Corporate Governance Committees and related information

### C.  The 2019 Proxy Statement

33.     On March 20, 2019, the Company filed with the SEC its Proxy Statement on Form 14a (the "2019 Proxy Statement"). The 2019 Proxy Statement identifies the persons being nominated as directors in connection with the Company's Annual Meeting of Shareholders which was held on May 1, 2019. In addition, it provides the Company's Code of Business Conduct and Ethics, which stated in relevant part:

> Our Board has adopted a code of ethics (the "Code of Conduct") which applies to all officers and employees, including our principal executive officer, principal financial officer and principal accounting officer. The Code of Conduct is available

on the Governance page of Realogy's website at www.realogy.com. The purpose of the Code of Conduct is: to promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; to promote full, fair, accurate, timely and understandable disclosure in periodic reports required to be filed by the Company;

- to protect Company information and assets; and

- to promote compliance with all applicable laws, rules and regulations that apply to the Company and its officers

34.    The 2019 Proxy Statement also stated, among other things:

Strong corporate governance is an integral part of our core values and practices. Please visit our website at www.realogy.com under the Governance page for the Board's Corporate Governance Guidelines, Director Independence Criteria, the Code of Ethics for Employees, the Code of Business Conduct and Ethics for Directors, the Board-approved charters for the Audit, Compensation and Nominating and Corporate Governance Committees and related information

35.    The 2017, 2018 and 2019 Proxy Statements were materially false and misleading because defendants were not making "full, fair, accurate, timely and understandable disclosure" in the periodic reports required to be filed by the Company.  Each, instead, falsely claimed compliance with high ethical standards in a concerted effort to solicit the votes necessary to be elected to the Board of the Company.

## V.    MATERIALLY FALSE AND MISLEADING STATEMENTS IN REALOGY'S PERIODIC YEAR END REPORTS

36.    On February 24, 2017, the Company filed its annual report on Form 10-K with the SEC for the year ending December 31, 2016 (the "2016 10-K"). The 2016 10-K was signed by Defendants R. Smith, S. Smith, Hull, Gustavson, Dias, Espe, Hailey, Niederauer, Terrill, Williams, and Alvarez. Attached to the 2016 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Smith and Hull attesting that (1) the 2016 10-K does not contain any untrue statement of fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not

misleading with respect to the period covered by the 2016 10-K; and that (2) based on the signer's

knowledge, the financial statements, and other financial information included in the 2016 10-K

report (including, financial statements, footnotes to the financial statements, selected financial

data, management's discussion and analysis of operations and financial condition and other

financial information in the report), fairly present in all material respects the financial condition,

results of operations and cash flows of Realogy as of, and for, the periods presented in the 2016

10-K.

37.     The 2016 10-K discussed competition and the regulatory scheme, stating in relevant

part:

> Our company owned real estate brokerage business is also subject to numerous
> federal, state and local laws and regulations that contain general standards for and
> limitations on the conduct of real estate brokers and sales associates, including
> those relating to the licensing of brokers and sales associates, fiduciary and agency
> duties, administration of trust funds, collection of commissions, restrictions on
> information sharing with affiliates, fair housing standards and advertising and
> consumer disclosures. Under state law, our company owned real estate brokers have
> certain duties to supervise and are responsible for the conduct of their brokerage
> businesses. Although real estate sales associates historically have been classified as
> independent contractors, newer rules and interpretations of state and federal
> employment laws and regulations, including those governing employee
> classification and wage and hour regulations, may impact industry practices and
> our company owned brokerage operations. Real estate licensing laws generally
> permit brokers to engage sales associates as independent contractors but require
> that the broker supervise their activities.

38.     The 2016 10-K also discussed the Company's compliance with applicable

regulations, stating in relevant part:

> Several of our businesses are highly regulated and any failure to comply with such
> regulations or any changes in such regulations could adversely affect our business.

> The sale of franchises is regulated by various state laws as well as by the FTC. The
> FTC requires that franchisors make extensive disclosure to prospective franchisees
> but does not require registration. A number of states require registration and/or
> disclosure in connection with franchise offers and sales. In addition, several states
> have "franchise relationship laws" or "business opportunity laws" that limit the

ability of franchisors to terminate franchise agreements or to withhold consent to the renewal or transfer of these agreements.

Our company owned real estate brokerage business must comply with the requirements governing the licensing and conduct of real estate brokerage and brokerage-related businesses in the jurisdictions in which we do business. These laws and regulations contain general standards for and limitations on the conduct of real estate brokers and sales associates, including those relating to licensing of brokers and sales associates, fiduciary and agency duties, administration of trust funds, collection of commissions, advertising and consumer disclosures. Under state law, our real estate brokers have certain duties and are responsible for the conduct of their brokerage business.

Our company owned real estate brokerage business, our relocation business, our mortgage origination joint venture, our title and settlement service business and the businesses of our franchisees (excluding commercial brokerage transactions) must comply with the Real Estate Settlement Procedures Act ("RESPA"). RESPA and comparable state statutes prohibit providing or receiving payments, or other things of value, for the referral of business to settlement service providers in connection with the closing of real estate transactions involving federally-backed mortgages. RESPA and related regulations do, however, contain a number of provisions that allow for payments or fee splits between providers, including fee splits between brokers and agents, fees splits between brokers, and market-based fees for the provision of actual goods or services. In addition, RESPA allows for referrals to affiliated entities, including joint ventures, when specific requirements have been met. We rely on these provisions in conducting our business activities and believe our arrangements comply with RESPA. RESPA, however, has become a greater challenge in recent years for most industry participants offering settlement services, including mortgage companies, title companies and brokerages, because of changes in the regulatory environment and expansive interpretation of RESPA or similar state statutes by certain courts. With the passage of Dodd-Frank in 2010, primary responsibility for enforcement of RESPA has shifted to the CFPB. The CFPB has taken a much stricter approach toward interpretation of RESPA and related regulations than the prior regulatory authority (the Department of Housing and Urban Development) and has become significantly more active in the use of enforcement proceedings. In the face of this changing regulatory landscape, various industry participants, while disagreeing with the CFPB's narrow interpretation of RESPA, have nevertheless decided to modify or terminate long-standing business arrangements to avoid the risk of protracted and costly litigation defending such arrangements. RESPA also has been invoked by plaintiffs in private litigation for various purposes, including an action filed against us, our joint venture and PHH that is described in Note 14, "Commitments and Contingencies—Litigation" to our consolidated financial statements included elsewhere in this Annual Report, and narrower interpretations of state statutes similar to RESPA and enforcement proceedings of those statutes by state regulatory authorities.

39.     On February 27, 2018, the Company filed its annual report on Form 10-K with the SEC for the year ending December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Schneider, Hull, Gustavson, Williams, Dias, Espe, Hailey, Niederaurer, S. Smith, and Terrill. Attached to the 2017 10-K were SOX certifications signed by Defendants Schneider and Hull attesting that (1) the 2017 10-K does not contain any untrue statement of fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the 2017 10-K and that (2) based on the signer's knowledge, the financial statements, and other financial information included in the 2017 10-K report (including, financial statements, footnotes to the financial statements, selected financial data, management's discussion and analysis of operations and financial condition and other financial information in the report), fairly present in all material respects the financial condition, results of operations and cash flows of Realogy as of, and for, the periods presented in the 2017 10-K.

40.     The 2017 10-K discussed, among other things, competition and regulations, stating in relevant part:

> **Real Estate Regulation.** RESPA, state real estate brokerage laws and similar laws in countries in which we do business restrict payments which real estate brokers, title agencies, mortgage bankers, mortgage brokers and other settlement service providers may receive or pay in connection with the sales of residences and referral of settlement services (e.g., mortgages, homeowners insurance and title insurance). Such laws may to some extent impose limitations on preferred alliance and other arrangements involving our real estate franchise, real estate brokerage, settlement services and relocation businesses or the business of our mortgage origination joint venture. In addition, with respect to our company owned real estate brokerage, relocation and title and settlement services businesses as well as our mortgage origination joint venture, RESPA and similar state laws require timely disclosure of certain relationships or financial interests with providers of real estate settlement services.
>
> RESPA and related regulations do, however, contain a number of provisions that allow for payments or fee splits between providers, including fee splits between

brokers and agents and market-based fees for the provision of actual goods or services. In addition, RESPA allows for referrals to affiliated entities, including joint ventures, when specific requirements have been met. We rely on these provisions in conducting our business activities and believe our arrangements comply with RESPA. RESPA compliance, however, has become a greater challenge in recent years for most industry participants offering settlement services, including mortgage companies, title companies and brokerages, because of changes in the regulatory environment and expansive interpretations of RESPA or similar state statutes by certain courts.

Pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), administration of RESPA has been moved from the Department of Housing and Urban Development ("HUD") to the Consumer Financial Protection Bureau (the "CFPB"). The CFPB has taken, in the recent past, a much stricter approach toward interpretation of RESPA and related regulations than HUD and has significantly increased the use of enforcement proceedings. In the face of this changing regulatory landscape, various industry participants, while disagreeing with the CFPB's narrow interpretation of RESPA, have nevertheless decided to modify or terminate long-standing business arrangements to avoid the risk of protracted and costly litigation defending such arrangements. At present, leadership at the CFPB is in transition, with a new acting director. In the message accompanying the new five-year Strategic Plan published by the CFPB in February 2018, the acting director summarized the changes at the CFPB -- to fulfill its statutory responsibilities, but to go no further. The Strategic Plan notes that the CFPB will focus on protecting the legal rights of consumers while engaging in rulemaking where appropriate to address unwarranted regulatory burdens. Beyond the CFPB enforcement practices, private RESPA litigation may also be pursued, including an action settled by us, our former joint venture and PHH that is described in Note 13, "Commitments and Contingencies—Litigation", to our consolidated financial statements included elsewhere in this Annual Report. In addition, permissible activities under state statutes similar to RESPA may be interpreted more narrowly and enforcement proceedings of those statutes by state regulatory authorities may also be aggressively pursued.

Our company owned real estate brokerage business is also subject to numerous federal, state and local laws and regulations that contain general standards for and limitations on the conduct of real estate brokers and sales agents, including those relating to the licensing of brokers and sales agents, fiduciary and agency duties, consumer disclosure obligations, administration of trust funds, collection of commissions, restrictions on information sharing with affiliates, fair housing standards and advertising and consumer disclosures. Under state law, our company owned real estate brokers have certain duties to supervise and are responsible for the conduct of their brokerage businesses. Although real estate sales agents historically have been classified as independent contractors, newer rules and interpretations of state and federal employment laws and regulations, including those governing employee classification and wage and hour regulations, may

impact industry practices and our company owned brokerage operations. Real estate licensing laws generally permit brokers to engage sales agents as independent contractors but require that the broker supervise their activities.

41. The 2017 10-K also discussed compliance with applicable regulations, stating in relevant part:

> Several of our businesses are highly regulated and any failure to comply with such regulations or any changes in such regulations could adversely affect our business.
>
> The sale of franchises is regulated by various state laws as well as by the Federal Trade Commission (the "FTC"). The FTC requires that franchisors make extensive disclosure to prospective franchisees but does not require registration. A number of states require registration and/or disclosure in connection with franchise offers and sales. In addition, several states have "franchise relationship laws" or "business opportunity laws" that limit the ability of franchisors to terminate franchise agreements or to withhold consent to the renewal or transfer of these agreements.
>
> Our company owned real estate brokerage business must comply with the requirements governing the licensing and conduct of real estate brokerage and brokerage-related businesses in the jurisdictions in which we do business. These laws and regulations contain general standards for and limitations on the conduct of real estate brokers and sales agents, including those relating to licensing of brokers and sales agents, fiduciary, agency and statutory duties, administration of trust funds, collection of commissions, advertising and consumer disclosures. Under state law, our real estate brokers have certain duties and are responsible for the conduct of their brokerage business.
>
> Our company owned real estate brokerage business, our relocation business, our mortgage origination joint venture, our title and settlement service business and the businesses of our franchisees (excluding commercial brokerage transactions) must comply with the Real Estate Settlement Procedures Act ("RESPA"). RESPA and comparable state statutes prohibit providing or receiving payments, or other things of value, for the referral of business to settlement service providers in connection with the closing of real estate transactions involving federally-backed mortgages. RESPA and related regulations do, however, contain a number of provisions that allow for payments or fee splits between providers, including fee splits between brokers and agents, fees splits between brokers, and market-based fees for the provision of actual goods or services. In addition, RESPA allows for referrals to affiliated entities, including joint ventures, when specific requirements have been met. We rely on these provisions in conducting our business activities and believe our arrangements comply with RESPA. RESPA, however, has become a greater challenge in recent years for most industry participants offering settlement services, including mortgage companies, title companies and brokerages, because of changes

in the regulatory environment and expansive interpretations of RESPA or similar state statutes by certain courts.

42. On February 26, 2019, the Company filed its annual report on Form 10-K with the SEC for the year ending December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Schneider. Gustavson. Williams, Hailey, Dias, Espe, Koehler, Niederauer, Silva, S. Smith, Terrill, Alvarez, and Hull. Attached to the 2018 10-K were SOX certifications signed by defendants Schneider and Gustavson attesting that (1) the 2018 10-K does not contain any untrue statement of fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the 2018 10-K; and that (2) based on the signer's knowledge, the financial statements, and other financial information included in the 2018 10-K report (including, financial statements, footnotes to the financial statements, selected financial data, management's discussion and analysis of operations and financial condition and other financial information in the report), fairly present in all material respects the financial condition, results of operations and cash flows of Realogy as of, and for, the periods presented in the 2018 10-K.

43. The 2018 10-K discussed, among other things, competition and regulations, stating in relevant part:

**Commission Plan Competition Among Real Estate Brokerages.**

Some of the firms competing for sales agents use different commission plans, which may be appealing to certain sales agents. There are several different commission plan variations that have been historically utilized by real estate brokerages to compensate their independent sales agents. One of the most common variations has been the traditional graduated commission model where the independent sales agent receives a percentage of the brokerage commission that increases as the independent sales agent increases his or her volume of homesale transactions, and the brokerage frequently provides independent sales agents with a broad set of support offerings and promotion of properties. Other common plans include a desk

rental or 100% commission plan, a fixed transaction fee commission plan, and a capped commission plan. A capped commission plan generally blends aspects of the traditional graduated commission model with the 100% commission plan.

Although less common, some real estate brokerages employ their sales agents and, in such instances, employee agents may earn smaller brokerage commissions in exchange for other employee benefits or bonuses. Most brokerages focus primarily on one type of commission plan though some may offer one or more of commission plan variations to their sales agents.

Our company owned brokerage service has historically compensated affiliated independent sales agents using a traditional graduated commission model that emphasizes the value proposition offered to independent sales agents and independent sales agent teams, although we have utilized elements of other commission plans in certain geographic markets and have recently begun to expand our use of alternative commission plans at our company owned brokerages in certain territories.

44.     The 2018 10-K discussed government regulations, stating in relevant part:

RESPA. RESPA, state real estate brokerage laws and similar laws in countries in which we do business restrict payments which real estate brokers, title agencies, mortgage bankers, mortgage brokers and other settlement service providers may receive or pay in connection with the sales of residences and referral of settlement services (e.g., mortgages, homeowners insurance and title insurance). Such laws may to some extent impose limitations on arrangements involving our real estate franchise, real estate brokerage, settlement services and relocation businesses or the business of our mortgage origination joint venture. In addition, with respect to our company owned real estate brokerage, relocation and title and settlement services businesses as well as our mortgage origination joint venture, RESPA and similar state laws generally require timely disclosure of certain relationships or financial interests with providers of real estate settlement services. Pursuant to the Dodd-Frank Act, the Consumer Financial Protection Bureau (the "CFPB") administers RESPA. Some state authorities have also asserted enforcement rights.

RESPA and related regulations do, however, contain a number of provisions that allow for payments or fee splits between providers, including fee splits between title underwriters and agents, real estate brokers and agents and market-based fees for the provision of goods or services and marketing arrangements. In addition, RESPA allows for referrals to affiliated entities, including joint ventures, when specific requirements have been met. We rely on these provisions in conducting our business activities and believe our arrangements comply with RESPA. RESPA compliance, however, has become a greater challenge under certain administrations for most industry participants offering settlement services, including mortgage companies, title companies and brokerages, because of changes in the regulatory environment and expansive interpretations of RESPA or similar state statutes by

certain courts. Permissible activities under state statutes similar to RESPA may be interpreted more narrowly and enforcement proceedings of those statutes by state regulatory authorities may also be aggressively pursued. RESPA also has been invoked by plaintiffs in private litigation for various purposes.

45.     The 2018 10-K also discussed compliance with applicable regulations, stating in

relevant part:

> Several of our businesses are highly regulated and any failure to comply with such regulations or any changes in such regulations could adversely affect our business.
>
> Our company owned real estate brokerage business, our relocation business, our mortgage origination joint venture, our title and settlement service business and the businesses of our franchisees (excluding commercial brokerage transactions) must comply with the Real Estate Settlement Procedures Act ("RESPA"). RESPA and comparable state statutes prohibit providing or receiving payments, or other things of value, for the referral of business to settlement service providers in connection with the closing of real estate transactions involving federally-backed mortgages. RESPA and related regulations do, however, contain a number of provisions that allow for payments or fee splits between providers, including fee splits between title underwriters and agents, brokers and agents, and market-based fees for the provision of goods or services and marketing arrangements. In addition, RESPA allows for referrals to affiliated entities, including joint ventures, when specific requirements have been met. We rely on these provisions in conducting our business activities and believe our arrangements comply with RESPA. RESPA compliance, however, has become a greater challenge under certain administrations for most industry participants offering settlement services, including mortgage companies, title companies and brokerages, because of changes in the regulatory environment and expansive interpretations of RESPA or similar state statutes by certain courts. Permissible activities under state statutes similar to RESPA may be interpreted more narrowly and enforcement proceedings of those statutes by state regulatory authorities may also be aggressively pursued. RESPA also has been invoked by plaintiffs in private litigation for various purposes and some state authorities have also asserted enforcement rights. Similar laws exist in other countries where we do business.
>
> * * *
>
> Our company owned real estate brokerage business must comply with the requirements governing the licensing and conduct of real estate brokerage and brokerage-related businesses in the jurisdictions in which we do business. These laws and regulations contain general standards for and limitations on the conduct of real estate brokers and sales agents, including those relating to licensing of brokers and sales agents, fiduciary, agency and statutory duties, administration of trust funds, collection of commissions, advertising and consumer disclosures. Under state law, our real estate brokers have certain duties and are responsible for the conduct of their brokerage business.

46.     The statements referenced above from Realogy's 2016, 2017 and 2018 10-Ks, which were all statements signed by the Individual Defendants, except those who had retired from the Board at the time of the filings, were materially false and/or misleading because they misinterpreted and failed to disclose the following adverse facts and the making of such materially false and misleading statements has led to harm to Realogy because it resulted in the bringing of a securities class action. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (1) Realogy was engaged in anticompetitive behavior by requiring property sellers to pay the commissions of a buyer's broker at an inflated rate; (2) Realogy's anticompetitive actions would prompt the U.S. Department of Justice ("DOJ") to open an antitrust investigation into the real estate industry's practices regarding brokers' commissions; and (3) as a result, the Individual Defendants' statements about the Realogy's business, operations and regulatory scheme and compliance therewith were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## VI.    THE TRUTH EMERGES

47.     On March 11, 2019, the article "*A new class action lawsuit could upend the real estate business as we know it*" was published on *The Real Deal*. The article revealed that a lawsuit was filed against several realtors, including Realogy, which alleged that Realogy and others were violating antitrust laws. The article stated in relevant part:

> It takes aim at some of the central tenets of the U.S. real estate business: Multiple Listing Services and buyer's broker's commissions. ***A new class action lawsuit alleges that the National Association of Realtors, along with the "Big Four" — Realogy, HomeServices of America, RE/MAX and Keller Williams — violated federal antitrust law by conspiring to require home sellers to pay buyer's broker's commissions at inflated rates.*** The suit was first reported by Inman.

***The complaint, filed March 6, takes aims at NAR rules that require all brokers to offer buyer broker compensation when listing a property on a MLS, saying this has driven up costs to the seller and stifled competition.***

"Because most buyer brokers will not show homes to their clients where the seller is offering a lower buyer broker commission, or will show homes with higher commission offers first, sellers are incentivized when making the required blanket, non-negotiable offer to procure the buyer brokers' cooperation by offering a high commission," the complaint reads, "Absent this rule, buyer brokers would be paid by their clients and would compete to be retained by offering a lower commission."

Filed on behalf of Christopher Moehrl, a homeseller from Minnesota, the lawsuit also says it will represent any home sellers who sold property and paid a broker commission in the last four years in specific geographic areas covered by different regional MLSs.

This includes areas in Texas, Maryland, North Carolina, Ohio, Colorado, Michigan, Florida, Nevada, Wisconsin, Minnesota, Pennsylvania, Arizona, Virginia, Utah and the District of Columbia.

(Emphasis added).

48.     On this news, shares of Realogy fell $0.21, or over 1.7%, to close at $12.07 on

March 12, 2019, damaging investors.

49.     On April 18, 2019, *Housingwire* reported in the article "*NAR slapped with second

class-action lawsuit to end buyer broker compensation*" which stated in relevant part:

A second class-action lawsuit has been filed in protest of the buyer broker compensation rules set forth by the National Association of Realtors.

The suit, filed in the Northern District of Illinois on Monday by Minnesota-based corporation Sawbill Strategic, alleges that NAR, Realogy, HomeServices of America, RE/MAX and Keller Williams violated federal antitrust laws by requiring property sellers to pay the buyer's broker an inflated fee.

The suit is nearly identical to one filed last month by a Minnesota home seller, which NAR called "baseless" and filled with "an abundance of false claims." The suit alleges that the defendants conspired to drive up seller costs and reduce competition by requiring a home seller to pay compensation to the buyer's broker, even though their involvement in the transaction is minimal.

According to the suit, NAR's Commission Rule maintains a commission requirement for buyer's brokers of 2.5-3% of the home's sale price. This has not changed in recent years, even as buyers increasingly turn to online listing sites to find their homes and often only retain a broker once a property has been selected.

The suit alleges that buyer broker compensation rules have remained intact despite their changing role in the home purchase transaction because of a conspiracy among the defendants.

It also notes that in markets abroad – like the U.K., Germany, Israel, Australia, and New Zealand – buyer broker fees are paid by the buyer rather than the seller and that buyers pay brokers less than half the rate paid in the U.S.

"Defendants and their co-conspirators possess market power through control local MLSs, which are databases of properties listed for sale in a particular geographic region," the complaint states. "A majority of homes in the United States are sold on such MLSs. Through their control of the MLSs, Defendants and their co-conspirators have market power in the local markets for real estate broker services."

50.    On this news, shares of Realogy fell $0.57, or over 4.4%, to close at $12.327 on April 22, 2019, further damaging investors.

51.    On May 22, 2019, media reports revealed that the DOJ opened an investigation regarding antitrust practices of the real estate industry, which included Realogy.

52.    That day, *Bloomberg* published the article, "U.S. Opens Antitrust Probe of Real Estate Brokerage Industry" which discussed the investigation, stating in relevant part:

> ***U.S. antitrust officials are investigating potentially anti-competitive practices in the residential real estate brokerage business, with a focus on compensation to brokers and restrictions on their access to listings.***
>
> The probe was detailed in a civil investigative demand, which is akin to a subpoena, issued by the Justice Department to CoreLogic Inc., which provides real estate data to government agencies, lenders and other housing-market participants.
>
> The U.S. residential real estate industry has long faced criticism that it stifles competition among brokerages, protecting agent commissions that are higher than those paid by sellers in many other countries. In 2008, the Justice Department reached a settlement with the National Association of Realtors, a trade group that was designed to lower commissions paid by consumers by opening the industry to internet-based brokers.

*The investigative demand to CoreLogic, dated last month, follows a lawsuit filed against the Realtors association and real estate broker franchisors, including Realogy Holdings Corp., claiming they conspired to prevent home sellers from negotiating commissions they pay to buyers' agents.*

\* \* \*

In June 2018, the Justice Department and Federal Trade Commission, which share antitrust jurisdiction in the U.S., held a workshop on the residential real estate brokerage industry that touched on the possible barriers to competition and the impact of past regulatory actions, among other issues.

According to the investigative demand sent to CoreLogic, the Justice Department is seeking information about the ability to search real estate listings on multiple listings services based on compensation offered to buyer brokers as well as practices that restrict CoreLogic's distribution of listings data.

News of the investigation was cheered by REX, an online brokerage that charges flat fees that it says are lower than those charged by traditional brokers.

"Any effort to shed light on these practices is good for the American consumer," REX Chief Executive Office Jack Ryan said in a statement. "Now is the time to drive change in the industry."

(Emphasis added).

53.     On this news, shares of Realogy fell an additional $0.71 per share, or over 9%, over the next two trading days to close at $7.13 per share on May 23, 2019, further damaging investors.

## VII.     THE DECISION IN THE SITZER ACTION

54.     In *Sitzer*, Plaintiffs alleged NAR, as a trade association for the real-estate industry in association with certain corporate defendants including Realogy, adopted and imposed anticompetitive restraints that inflated residential real estate commissions throughout Missouri, focusing primarily on Section 2-G-1 of NAR's MLS Listing Handbook—what plaintiffs referred to as the "Adversary Commission Rule."

55.     Plaintiffs in *Sitzer* were home sellers who listed their homes on one of four MLS marketplaces in Missouri: Kansas City MLS, St. Louis MLS, Springfield, Missouri MLS, and

Columbia, Missouri MLS.  They alleged that "[t]he cornerstone of Defendants' conspiracy was NAR's adoption and implementation of a rule that require[d] all seller's brokers to make blanket, unilateral and effectively non-negotiable offers of buyer broker compensation when listing a property on [MLS]."

56.   In denying the motion to dismiss, the Court held that the complaint alleged the existence of a conspiracy among NAR, Realogy, and other defendants because there was evidence that the defendants jointly agreed to comply with terms of an agreement to limit competition and fix pricing.  The Court also held that there was evidence of a concerted effort to restrain trade among NAR, Realogy, and other defendants by mandating the use of MLS.  Finally, the Court found there to be injury to plaintiffs premised on anticompetitive conduct.

57.   Specifically, Judge Bough stated that the home seller plaintiffs showed that Section 2-G-1 of the association's handbook — which lays out the commission rules — could "plausibly create a skewed compensation structure within the residential real estate market, leading to inflated commissions that would otherwise be lower under competitive market conditions."

58.   The Court also rejected the association and the franchisors' arguments that the plaintiffs failed to show they were injured enough by the rules to bring an antitrust claim. "Plaintiffs claim defendants' anticompetitive agreement forced them to pay higher total sales commissions when they sold their homes and forced them to pay elevated buyer-broker commissions to induce buyer-brokers to show their homes to prospective buyers." The Court further found that "[p]aying a higher price as a result of the alleged trade restraint is certainly the type of injury antitrust laws were intended to prevent."

## VIII.   DAMAGES TO REALOGY

59.   As a direct and proximate result of the Individual Defendants' conduct, Realogy is losing and expending, and will lose and expend, many millions of dollars.

60.   Expenditures incurred or to be incurred as a result of the conduct described in this complaint include, but are not limited to, legal fees and payments associated with the Antitrust Action, the DOJ investigation, and the Securities Class Action filed against the Company and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

61.   Realogy is also damaged as a result of the loss of reputation resulting from the Antitrust Misconduct.

62.   Further, the Company was damaged by the materially false and misleading statements made in the 2017, 2018 and 2019 Proxy Statements, as those Proxy Statements induced shareholders to re-elect the nominee Defendants who then continued to harm the Company, giving rise to actionable Section 14(a) claims and breach of fiduciary duty claims.

63.   As a direct and proximate result of the Individual Defendants' conduct, Realogy has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## IX.   DELAWARE STANDARD OF CONDUCT

64.   Delaware law sets a standard of the duty of loyalty duty of directors which requires directors to act in good faith to advance the best interests of the corporation and, similarly, to refrain from conduct that injures the corporation. The Director Defendants did not meet this standard.

65.     Delaware law also sets a standard for duty of care of directors which requires them to make informed business decisions, and in evaluating information provided by management, directors are expected to review the information critically and not accept it blindly.

66.     By reason of their positions as officers, directors, and/or fiduciaries of Realogy and because of their ability to control the business and corporate affairs of Realogy, the Individual Defendants owed Realogy and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Realogy in a fair, just, honest, and equitable manner.

67.     The Individual Defendants were and are required to act in furtherance of the best interests of Realogy and its shareholders so as to benefit all shareholders equally.

68.     The Individual Defendants, because of their positions of control and authority as directors and officers of Realogy, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

69.     To discharge their duties, the officers and directors of Realogy were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

70.     Each Individual Defendant, by virtue of his or her position as a director and/or officer of Realogy owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Realogy, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that

the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Realogy's Board at all relevant times.

71.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities and Exchange Acts and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of materially false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

72.     To discharge their duties, the officers and/or directors of Realogy were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.

73.     By virtue of such duties, the officers and directors of Realogy were required to, among other things:(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Realogy's Code of Business Conduct and Ethics, and Code of Business Conduct and Ethics for Directors; (b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting

the Company's assets, and to maximize the value of the Company's stock; (c) remain informed as to how Realogy conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices; (d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Realogy and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records; (e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Realogy's operations would comply with all applicable laws and Realogy's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate; (f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; (g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and (h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

74.     Each director and officer of the Company owes to Realogy and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealings.

75.     Each of the Defendants who are or were Realogy directors failed to discharge his or her duties as a director of Realogy in good faith, in a manner he or she reasonably believed to be in the best interests of Realogy, and with the care an ordinarily prudent person in a like position

would exercise under similar circumstances, thereby failing to adhere to the standard of conduct required.

## X.   DERIVATIVE ALLEGATIONS

76.   Plaintiff brings this action derivatively and for the benefit of Realogy to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Realogy, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) of the Exchange Act.

77.   Realogy is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

78.   Plaintiff owned Realogy common stock while defendants were engaging in the improper conduct described above. Plaintiff will adequately and fairly represent the interests of Realogy in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## XI.   DEMAND FUTILITY ALLEGATIONS

79.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

80.   A pre-suit demand on the Board of Realogy is futile and, therefore, excused. At the time of filing of this action, the Board consisted of the following individuals: Dias, Espe, Hailey, Koehler, Niederauer Schneider, Silva, S. Smith, Terrill, and Williams. Plaintiff only needs to allege demand futility as to six of the ten Directors who are on the Board at the time this action is commenced.

81.   Demand is excused as to all of the Individual Defendants because each one of them face, individually and collectively, a substantial likelihood of liability as a result of the actions they

engaged in with respect to the Antitrust Misconduct, to make and/or cause the Company to make the materially false and misleading statements and omissions of material fact. Indeed, each of the current directors of Realogy signed at least one of the 10-Ks alleged to be materially false and misleading and most of them signed all three 10-Ks that are the subject of the related securities class action.

82.    In addition, in complete abdication of their fiduciary duties, the Individual Defendants either knowingly or recklessly caused the Company to engage in, or allowed the Company to continue to engage in, the Antitrust Misconduct and to permit the materially misleading statements to be made in SEC filings signed by those Defendants that were directors at the time such document was filed with the SEC.

83.    As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

84.    The directors are responsible for the Realogy Code of Conduct and Ethics and yet, by making materially false and misleading statements or omitting to disclose material facts, have themselves violated the code which also supports the futility of any demand made on the board. Indeed the Defendants conducted little, if any, oversight of the Company's internal controls to provide assurance that all disclosures were materially accurate and that the Company was not violating any anti-trust laws.

85.    Demand in this case is excused because the Directors, of which nine of the ten Directors presently serving are named as defendants in this action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and

in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

86.    65.    All of the Individual Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Individual Defendants may not be indemnified for breaching the duty of candor. As a result, all of the Individual Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

87.    In violation of the Code of Ethics and the Code of Business Conduct and Ethics for Directors, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 14(a) of the Exchange Act. In further violation of the Code of Ethics, and Code of Business Conduct and Ethics for Directors, the Individual Defendants failed to comply with laws and regulations, particularly those regarding anti-trust and compete in an honest and ethical manner. Thus, the Individual Defendants face a substantial likelihood of liability and demand is futile as to them.

88.    Realogy has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Realogy any

part of the damages Realogy suffered, and will continue to suffer, thereby. Thus, any demand on the Directors would be futile.

89.     The acts complained of herein constitute violations of fiduciary duties owed Realogy's officers and directors, and these acts are incapable of ratification.

90.     The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Realogy. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Realogy, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

91.     If there is no directors' and officers' liability insurance, then the Directors will not cause Realogy to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

92.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least six of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Individual Defendants (except Hull and Gustavson) for Violations of
Section 14(a) of the Securities Exchange Act of 1934**

93.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

94.     The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the non-fraud claims.

95.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

96.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

97.    Under the direction and watch of the Directors then serving, the 2017 Proxy Statement was prepared and filed with the SEC and failed to disclose that: (1) the Company engaged in the Antitrust Misconduct; (2) the Company failed to maintain an adequate system of internal control regarding the process for making statements in periodic filings; (3) the Company did not adhere to its Code of Business Conduct and Ethics for Directors, referenced in the 2017 Proxy Statement; and (4) the Company did not adhere to its Code of Business Conduct and Ethics summarized in the 2017 Proxy Statement.

98.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 Proxy Statement were materially false and misleading or omitted to disclose material information necessary to make the statements contained therein not materially misleading.

99.    The misrepresentations and omissions were material to shareholders in deciding how to vote on the matters set forth for shareholder determination in the 2017 Proxy Statement, including election of directors and ratification of the appointment of an independent registered public accounting firm.

100.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2017 Proxy Statement.

101.    Under the direction and watch of the Directors then serving, the 2018 Proxy Statement was prepared and filed with the SEC and failed to disclose that: (1) the Company engaged in the Antitrust Misconduct; (2) the Company failed to maintain an adequate system of internal control regarding the process for making statements in periodic filings; (3) the Company did not adhere to its Code of Business Conduct and Ethics for Directors, referenced in the 2018

Proxy Statement; and (4) the Company did not adhere to its Code of Business Conduct and Ethics summarized in the 2018 Proxy Statement.

102.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2018 Proxy Statement were materially false and misleading or omitted to disclose material information necessary to make the statements contained therein not materially misleading.

103.     The misrepresentations and omissions were material to Realogy shareholders in deciding how to vote on the matters set forth for shareholder determination in the 2018 Proxy Statement, including election of directors and ratification of the appointment of an independent registered public accounting firm.

104.     The materially false and misleading elements of the 2018 Proxy Statement led to the re-election of Defendants Alvarez, Dias, Espe, Hailey, Terrill, Schneider, Niederauer, S Smith, and Williams which allowed them to continue breaching their fiduciary duties to owed to Realogy

105.     The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2018 Proxy Statement.

106.     Under the direction and watch of the Directors then serving, the 2019 Proxy Statement was prepared and filed with the SEC and failed to disclose that: (1) the Company engaged in the Antitrust Misconduct; (2) the Company failed to maintain an adequate system of internal control regarding the process for making statements in periodic filings; (3) the Company did not adhere to its Code of Business Conduct and Ethics for Directors, referenced in the 2019 Proxy Statement; and (4) the Company did not adhere to its Code of Business Conduct and Ethics summarized in the 2019 Proxy Statement.

107.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2019 Proxy Statement were materially false and misleading or omitted to disclose material information necessary to make the statements contained therein not materially misleading.

108.    The misrepresentations and omissions were material to Realogy shareholders in deciding how to vote on the matters set forth for shareholder determination in the 2019 Proxy Statement, including election of directors and ratification of the appointment of an independent registered public accounting firm.

109.    The materially false and misleading elements of the 2019 Proxy Statement led to the election or re-election of Defendants Dias, Espe, Hailey, Koehler, Terrill, Silva, Schneider, Niederauer, S Smith, and Williams which allowed them to continue breaching their fiduciary duties to owed to Realogy.

110.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2019 Proxy Statement.

111.    Plaintiff on behalf of Realogy has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

112.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

113.    Each Individual Defendant owed to the Company and its shareholders the duty to exercise candor, good faith, and loyalty in the management and administration of Realogy's business and affairs.

35

114.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

115.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company and its shareholders, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Realogy.

116.    In breach of their fiduciary duties, the Individual Defendants either engaged in, or allowed the Company to engage in, the Antitrust Misconduct.

117.    The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls in that there was no system in place to assure that the Company in its periodic SEC filings would make full disclosure of all material facts regarding the Antitrust Conduct and that the Company was not complying with its Corporate Governance Guidelines and Code of Business Conduct and Ethics for Directors.

118.    In further breach of their fiduciary duties owed to Realogy the Individual Defendants intentionally and/or recklessly allowed, made and/or caused the Company to make materially false and misleading statements of material fact and omit material facts in the statements made.

119.    Specifically, Defendants failed to disclose that: (1) the Company engaged in the Antitrust Misconduct; (2) that the Company was not complying with its Corporate Governance Guidelines and Code of Business Conduct and Ethics for Directors; and (3) as a result of the foregoing, Realogy's public statements set forth above were materially false and misleading at all relevant times.

120.    The Individual Defendants failed to correct and caused the Company to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

121.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

122.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Realogy has sustained and continues to sustain significant damages in that due to the issuance of materially false and misleading statements by the defendants, it is subject to securities class actions which could result in it paying very significant damages and legal fees and expenses. It is also the subject of private anti-trust actions and Department of Justice investigations into its violations of the anti-trust laws. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

123.    Plaintiff, on behalf of Realogy, has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Unjust Enrichment**

124.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

125.    By their wrongful acts and materially false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Realogy.

126.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative unjustly lucrative bonuses or received bonuses, stock options, or similar compensation from Realogy that was tied to the performance or artificially inflated valuation of

Realogy or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

127.     Plaintiff, as a shareholder and a representative of Realogy seeks restitution from the Individual Defendants and seeks an order from this Court disgorging any improper profits or compensation (including any performance-based or valuation-based compensation)—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

128.     Plaintiff, on behalf of Realogy, has no adequate remedy at law.

## XII.   <u>PRAYER FOR RELIEF</u>

WHEREAS, Plaintiff demands judgment in the Company's favor against all of the Individual Defendants, jointly and severally, as follows:

a.     Declaring that Plaintiff may maintain this action on behalf of Realogy, and that Plaintiff is an adequate representative of the Company;

b.     Declaring that the Individual Defendants have breached their fiduciary duties to Realogy and its shareholders;

c.     Declaring that the Individual Defendants who were directors of Realogy at the time the Proxy Statements referenced above were issued, violated Section 14(a) of the Exchange Act;

d.     Determining and awarding to Realogy the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

e.     Directing Realogy and the Individual Defendants that are presently directors or officers of Realogy to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws, and in particular federal and state anti-trust laws, the securities laws of the United States and corporate law of the State of Delaware to

protect Realogy and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Realogy to nominate at least five candidates for election to the board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations and in particular anti-trust laws, securities laws and the corporate laws of the State of Delaware;

f. Awarding Realogy restitution from Individual Defendants, and each of them;

g. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

h. Granting such other and further relief as the Court may deem just and proper.

Dated: October 23, 2019

LEVI & KORSINSKY, LLP

/s/Eduard Korsinsky
Eduard Korsinsky (ek@zlk.com)
Gregory Nespole (gnespole@zlk.com)
 (to be admitted *pro hac vice*)
55 Broadway, 10th Floor
New York, NY 10006
(212) 363-7500 (phone)
(212) 363-7171 (fax)

*Attorneys for Plaintiff*

**VERIFICATION**

I, Adam M. Fried, under penalties of perjury, hereby do declare that I am a plaintiff in the foregoing complaint, that I have read the complaint, and that the facts therein are true to my own knowledge, except to matters stated therein to be alleged upon information and belief, and as to those matters, I believe them to be true and correct to the best of my knowledge, information, and belief.

Signed:

Print Name: Adam Fried                    Date: 10/11/2019